**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ROBERT S. HUY, | ) CASE NO. 5:11-cv-1851 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | VECCHIARELLI |
| ) | |
| MICHAEL J. ASTRUE, ) | |
|    Commissioner of Social Security, ) | |
| ) | **MEMORANDUM OPINION AND** |
| Defendant. ) | **ORDER** |

Plaintiff, Robert S. Huy ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

**I.  PROCEDURAL HISTORY**

On August 10, 2009, Plaintiff filed applications for a POD, DIB, and SSI and

alleged a disability onset date of February 14, 2003. (Tr. 10.) The applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 10.) On March 15, 2011, an ALJ held Plaintiff's hearing. (Tr. 10.) Plaintiff appeared, was represented by counsel, and testified. (Tr. 10.) A vocational expert ("VE") also appeared and testified. (Tr. 10.) On April 1, 2011, the ALJ found Plaintiff not disabled. (Tr. 23.) On August 11, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On September 1, 2011, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.) On February 10, 2012, Plaintiff filed his Brief on the Merits. (Doc. No. 15.) On May 9, 2012, the Commissioner filed his Brief on the Merits. (Doc. No. 18.) On May 23, 2012, Plaintiff filed a brief in reply. (Doc. No. 19.)

Plaintiff asserts several assignments of error that may be summarized as one general contention: the ALJ's determination is not supported by substantial evidence because he "either omitted any analysis of or erred in his analysis of most of the opinions of record." (Pl.'s Br. 15.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was 14 years old on the alleged disability onset date (Tr. 21) and 23 years old on the date of his hearing (Tr. 35). He had a "marginal" education and was able to communicate in English. (Tr. 21.) He had no past relevant work experience.

2

(Tr. 21.)

### B. Medical Evidence

On February 14, 2003, a car struck Plaintiff while he was riding his bicycle. (Tr. 232.) Plaintiff had not been wearing a helmet, lost consciousness, suffered a tibiofibular fracture, and was admitted to the hospital. (Tr. 232.)

On April 29, 2003, Plaintiff underwent a clinical interview with Dr. Candice P. Hitchcock, Ph.D. (Tr. 225-27.) Dr. Hitchcock indicated the following. Plaintiff retained "relatively good verbal abilities" but exhibited "severely impaired new problem solving and abstract reasoning." (Tr. 226.) Plaintiff "also was impaired in attention and memory, and he had constructional dyspraxia." (Tr. 226.) Plaintiff's "attention/ concentration," however, "may have been premorbid." (Tr. 226.)

On June 20, 2003, Plaintiff underwent a neuropsychological evaluation with Dr. DeAnna Frye, Ph.D. (Tr. 423-28.) Dr. Frye indicated the following. Plaintiff was fifteen years old. (Tr. 423.) He had a past medical history of Attention Deficit Hyperactivity Disorder ("ADHD") and had been treated with Ritalin. (Tr. 424.) He was enrolled in the ninth grade and was in the process of receiving services for possible learning disabilities at the time he suffered the automobile accident. (Tr. 424.) Plaintiff reported that, since his accident, he noticed "changes" in his short term memory and required additional time to process information; but that he did not notice any changes in his "attentional abilities." (Tr. 424.)

Plaintiff exhibited a Verbal IQ score of 79, a Performance IQ score of 74, and a Full Scale IQ score of 75. (Tr. 425.) Dr. Frye diagnosed Plaintiff with a cognitive disorder not otherwise specified, borderline intellectual functioning, and traumatic brain

3

injury; and she assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 55.[1] (Tr. 427.) Dr. Frye recommended, among other things, that Plaintiff obtain an Individualized Education Plan ("IEP") at school; undergo an evaluation to determine whether he should continue medication for his "attentional concerns" and to assist with his irritability and aggressive angry outbursts; present to the Bureau of Vocational Rehabilitation when he became 16 years old for assistance with finding employment; and continue to undergo 24-hour supervision, as his decreased judgment, memory, and attention span created a higher risk of re-injury. (Tr. 427-28.)

On August 22, 2003, Plaintiff presented to Dr. Shu Que Huang[2] for a follow-up on his brain injury. (Tr. 210-11.) Dr. Huang indicated that Plaintiff reported the following. Plaintiff suffered mild cognitive and behavioral problems, mild short-term memory problems, and numbness and slight dis-coordination on his left side. (Tr. 210.) He interacted with his peers appropriately; but he continued to suffer poor concentration, earned C's and D's in school, and was planning to start a summer tutoring program. (Tr. 210.) Dr. Huang further indicated the following. Aside from the left tibiofibular fracture and residual memory problems, Plaintiff was making "a good progress of functions." (Tr. 210.) Plaintiff's leg was healing well, and Dr. Huang did not believe that Plaintiff needed medication for his ADHD. (Tr. 211.) Plaintiff's "neuropsy"

---

[1] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

[2] Dr. Huang's credentials are not clearly indicated in the record.

4

report indicated that Plaintiff had "a lot of deficits," but Plaintiff continued to improve. (Tr. 211.)

On September 18, 2003, Plaintiff underwent a re-evaluation of his cognitive functioning with his school psychologist, Ms. Gail Porter,[3] in relation to developing an appropriate IEP. (Tr. 410-21.) Ms. Porter indicated that Plaintiff exhibited a Verbal IQ score of 74, a Performance IQ score of 87, and a Full Scale IQ score of 78. (Tr. 412.) Ms. Porter summarized that Plaintiff "may continue to have problems with memory skills, including short and long term memory, visual/motor skills, and numerical reasoning skills." (Tr. 412.) Ms. Porter further indicated that: instructions and directions would have to be repeated and would be better understood if explained in a short and precise manner; more samples would have to be given when doing something new and different; visual materials along with verbal explanations would be helpful; and work may need to be checked to be sure that Plaintiff remained on task. (Tr. 419.)

A September 15, 2005, IEP report indicates that Plaintiff "ha[d] difficulty staying on task and may need a longer time than his peers to learn new information"; Plaintiff's oral expression and listening comprehension were in the low average range; Plaintiff would require explanations to be short, precise, and repeated; and Plaintiff would benefit from visual cues. (Tr. 433.)

On August 23, 2006, Plaintiff presented to Dr. Karman Radwan, M.D., for a consultative psychological examination of his short term memory. (Tr. 591-92.) Dr.

---

[3] The record does not clearly indicate Ms. Porter's credentials.

Radwan indicated the following.  Plaintiff presented friendly, attentive, fully communicative, casually groomed, with a normal weight, and relaxed.  (Tr. 591.)  His language skills were intact:  his speech was fluent and at a normal rate, volume, and articulation; and he was coherent and spontaneous.  (Tr. 591.)  However, his vocabulary and fund of knowledge indicated cognitive functioning in the borderline range.  (Tr. 592.)  Dr. Radwan assigned Plaintiff a GAF score of 40.[4]

On May 21, 2007, Plaintiff presented to Dr. Scott F. Brown, M.D., for a "disability physical."  (Tr. 442, 506-07.)  Dr. Brown indicated that "neuropsychiatry testing from June 2003 revealed severe cognitive impairment with borderline intellectual functioning and impairment of his memory," and that "[a]t this point I do feel that he is unemployable because of his previous brain injury and resulting decrease in his intellectual functioning and memory."  (Tr. 442.)

On September 29, 2009, Dr. Branden Weisgarber, Ph.D., authored a medical source statement and indicated the following.  (Tr. 550-51.)  Plaintiff's sitting, standing, and walking were not affected by his impairments.  (Tr. 551.)  He could lift and carry up to 25 pounds frequently and 50 pounds occasionally.  (Tr. 551.)  He was moderately limited in his ability to perform repetitive foot movements because he had "balance issues."  (Tr. 551.)  Otherwise, Plaintiff had no physical limitations.  (*See* Tr. 551.) Plaintiff required a psychological assessment.  (Tr. 550.)  Nevertheless, Plaintiff was

---

[4] A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family, and be unable to work.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra* note 1, at 34.

6

unemployable for 12 months or more. (Tr. 551.)

On October 23, 2009, Plaintiff underwent a mental functional capacity assessment with Dr. Ralph Huhn, Ph.D. (Tr. 555.) Dr. Huhn indicated the following. Plaintiff was markedly limited in his abilities to: understand and remember detailed instructions; carry out very detailed instructions; and maintain attention and concentration for extended periods of time. (Tr. 555.) He was moderately limited in his abilities to: remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately with the general public; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 555.) He was not significantly limited in his abilities to: ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriately behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. (Tr. 555.)

On October 30, 2009, Plaintiff underwent a clinical interview with Dr. Curt Ickes,

Ph.D., at the request of the Bureau of Disability Determination. (Tr. 525-29.) Dr. Ickes indicated the following. Plaintiff was mildly impaired in his abilities to relate with others, including fellow workers and supervisors; and understand, remember, and follow instructions. (Tr. 528.) He was moderately impaired in his abilities to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks; and withstand the stress and pressures associated with day-to-day work activities. (Tr. 529.)

On November 19, 2009, state agency reviewing psychologist Leslie Rudy, Ph.D., performed a Psychiatric Review Technique, as well as a mental residual functional capacity ("RFC") assessment. (Tr. 531-47.) Dr. Rudy indicated the following in her Psychiatric Review Technique. Dr. Rudy assessed Plaintiff under Listing 12.02 regarding organic mental disorders and found that Plaintiff suffered borderline intellectual functioning, a history of ADHD, a learning disorder, and a history of traumatic brain injury. (*See* Tr. 535.) Plaintiff was moderately restricted in his activities of daily living and in maintaining concentration, persistence, or pace. Further, he was mildly restricted in maintaining social functioning, and he had no episodes of decompensation of extended duration. (Tr. 545.)

Dr. Rudy indicated the following in her mental RFC assessment. Plaintiff was moderately impaired in his abilities to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and

8

length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (Tr. 531-32.) Plaintiff otherwise was not significantly limited. (Tr. 531-32.) Dr. Rudy concluded that Plaintiff "can work in an environment without demands for fast pace, high production or frequent changes in assigned tasks[,] . . . interact on a superficial level but would not tolerate demands from sustained interactions with the general public[, and] . . . adapt to routine changes"; and that Plaintiff "remains capable of simple, repetitive work done when changes and directions can be explained verbally." (Tr. 534.)

On September 7, 2010, Plaintiff underwent a neuropsychological evaluation with Dr. Richard Litwin, Ph.D. (Tr. 558-62.) Dr. Litwin indicated the following. Plaintiff exhibited a Verbal IQ score of 80, a Performance IQ score of 80, and a Full Scale IQ score of 78. (Tr. 559.) Plaintiff's "IQ scores fell within the uniform low average range." (Tr. 559.) Dr. Litwin diagnosed Plaintiff with a reading disorder, a mathemetics disorder, a cognitive disorder not otherwise specified, ADHD combined type, an adjustment disorder with depressed features, and a traumatic brain injury; and Dr. Litwin assessed Plaintiff with a GAF score of 64.[5] (Tr. 561.)

---

[5] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra* note 1, at 34.

Dr. Litwin further indicated the following.  Plaintiff "would need to commit to a rigorous course of study to pass the GED test."  (Tr. 561.)  Dr. Litwin recommended testing accommodations including extended time, the use of a calculator and a spell-checking device, a distraction-free environment, and frequent rest breaks.  (Tr. 561.)  Plaintiff expressed an interest in construction work, and such work "would seem a fair fit for him."  (Tr. 561.)  However, he would need to work with his hands, move around on the job, and have ongoing access to visual cues to guide his work effort.  (Tr. 561.)  Further, tasks would need to be action-oriented to grab and hold his attention.  (Tr. 561.)  Dr. Litwin opined that Plaintiff "may be able to compensate for his memory loss by developing a simple skill set with strong body memories"; and he recommended that Plaintiff use a simple day planner to keep track of tasks and use a programmable cellular telephone for reminders.  (Tr. 561.)  Finally, Dr. Litwin opined that Plaintiff should "avoid tasks that require [him] to work under pressure, stress, or in close quarters with a lot of other people."  (Tr. 562.)

 **C. Hearing Testimony**

  **1. Plaintiff's Hearing Testimony**

Plaintiff testified at his hearing as follows.  Plaintiff was able to read and write.  (Tr. 40.)  He had no problems sitting, standing, and walking except that he had a slight limp in his walk.  (Tr. 41.)  He was terminated from prior jobs for reasons including that he did not have transportation to get to work, and he failed to obtain a doctor's note when he was absent with pneumonia.  (Tr. 37-39.)  He quit one job as a dish washer because he was unable to maintain the pace of the work and his employer was not

pleased with him.  (Tr. 39.)  He believed he was unable to work because "everyone piles everything on top of [him] all at once" and he becomes "overwhelmed."  (Tr. 40.)  He also suffered short-term memory loss.  (Tr. 41.)  He agreed with the ALJ that it would be helpful if work were limited to simple tasks that were explained to him.  (Tr. 40-41.)

### 2. Vocational Expert's Hearing Testimony

The ALJ posed the following hypothetical to the VE:

> [A]ssume an individual with the same vocational profile as the claimant in terms of age, education and work experience, who is able to perform simple, repetitive work . . . in a low stress environment, without demands for fast paced, high production or frequent changes in assigned tasks. Where changes in directions can be explained verbally.
>
> Also, this individual would be able to interact on a superficial level, and would be able to adapt to routine changes that are explained.

(Tr. 51-52.)  The VE testified that such a person would be able to perform other work in the national economy as a cleaner or janitor (for which there were 85,000 jobs in Ohio and 2.1 million jobs in the nation), hand packer such as a shoe packer (for which there were 51,000 jobs in Ohio and 778,000 jobs in the nation), and automatic car wash dryer (for which there were 12,000 jobs in Ohio and 331,000 jobs in the nation).  (Tr. 52-53.)

The ALJ posed additional limitations to the hypothetical person:  the hypothetical person would be limited to lifting 25 pounds frequently and 50 pounds occasionally; could perform no more than occasional repetitive foot movements; and was limited to occasional use of the non-dominant, left upper extremity.  (Tr. 53-54.)  The VE testified that such a person could still perform the hand packer job if he could use his left extremity as a "helper"; could still perform the car wash dryer job, except that the total

11

number of jobs in the national economy would be reduced by half; and could still perform the janitor or cleaner job, except that the total number of jobs in Ohio would be reduced to 21,000 and the total number of jobs in the national economy would be reduced to 500,000. (Tr. 54-55.)

The ALJ then asked whether the hypothetical person could work if, because of difficulties with concentration, he were off task up to 10 percent of the time. (Tr. 55.) The VE responded that such a person would be able to work, but if he were off task for 15 percent of the time or more he "would have difficulty in sustaining [substantial gainful activity]." (Tr. 56.)

The VE further testified upon Plaintiff's counsel's questioning that an individual who was off task 20 percent of the time would be precluded from performing work; and that an individual who was required to have instructions repeated to him on a daily basis in order to remain on task would require a "special accommodation." (Tr. 57.)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled

by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2. The claimant has not engaged in substantial gainful activity since February 14, 2003, the alleged onset date.

3. The claimant has the following severe impairments: borderline intellectual functioning secondary to status post brain trauma, learning disability, attention deficit hyperactivity disorder[,] and left upper extremity dysfunction.

4. The claimant does not have an impairment of combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work . . . with the following nonexertional limitations:  The claimant is limited to only occasional use of his left, non-dominant upper extremity and only occasional repetitive foot movements.  In addition, the claimant is limited to simple, routine work in a low stress environment without demands for fast pace, high production quotas or frequent changes in assigned tasks.  The claimant is also limited to work where changes in directions can be explained verbally.  Further, the claimant is limited to superficial interaction with others.  Lastly, due to difficulties with concentration, the claimant can be expected to be off task up to fifteen percent (15%) of the time.

. . . . .

9. Transferability of job skills is not an issue because the claimant does not have past relevant work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 14, 2002, through the date of this decision.

(Tr. 12-22.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made

14

pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009).

### B. Plaintiff's Assignments of Error

Plaintiff takes issue the ALJ's analysis of several medical and other sources, as follows:

15

- Although the ALJ mentioned Dr. Frye's opinions, the ALJ failed to discuss Dr. Frye's opinions in significant detail—specifically that Plaintiff would need double the average time to complete school work in a quiet environment with minimized distractions, written copies of classroom lectures, open-book examinations, and individualized tutoring; and that Plaintiff would need 24-hour supervision.

- The ALJ failed to consider Dr. Radwan's opinions that Plaintiff suffered poor insight and that Plaintiff's vocabulary and fund of knowledge were in the borderline range.[6]

- Although the ALJ discussed Dr. Litwin's opinions, it is "not clear" whether the ALJ considered Dr. Litwin's opinion "in their entirety" because the ALJ did not discuss Dr. Litwin's opinions that Plaintiff may be able to pass the GED test with accommodations such as extended time and frequent breaks; or that construction work would be a "fair fit" for Plaintiff provided that he could work with his hands, move around on the job, have ongoing access to visual cues to guide his work effort, be assigned tasks that are "action oriented to grab and hold his attention," be able to use a day planner to keep track of tasks, be able to use a programmable cellular telephone for reminders, and possibly obtain counseling if interpersonal problems and negative relationships with co-workers threatened his job security.

- The ALJ failed to address the opinions of Plaintiff's school psychologist, Ms. Porter, and incorporate her opinions into Plaintiff's RFC—namely, that instructions and directions would have to be repeated and would be

---

[6] Plaintiff argues for the first time in his Reply Brief that Dr. Radwan's opinion that Plaintiff exhibited a GAF score of 40 was supported by the record. Plaintiff is cautioned that substantive arguments should not be presented for the first time in a reply brief, as such untimely arguments may be deemed waived. *See United States v. Moore*, 376 F.3d 570, 576 (6th Cir. 2004) (declining to consider issues not raised in the appellant's opening brief); *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1007 (6th Cir. 2009) ("These waiver and forfeiture rules ensure fair and evenhanded litigation by requiring parties to disclose legal theories early enough in the case to give an opposing party time not only to respond but also to develop an adequate factual record supporting their side of the dispute."). Further, the ALJ found Dr. Radwan's GAF score unreliable because it appeared to be based solely on Plaintiff's subjective reports and was inconsistent with the rest of Dr. Radwan's notes; and because Dr. Radwan's treatment relationship with Plaintiff was not clear. These were valid reasons to reject Dr. Radwan's opinions, and Plaintiff had not taken issue with them.

16

> better understood if explained in a short and precise manner; more samples would have to be given when doing something new and different; visual materials along with verbal explanations would be helpful; and work may need to be checked to be sure that Plaintiff remained on task.

- The ALJ failed to discuss Plaintiff's September 15, 2005, IEP report, which indicates that Plaintiff needed more time than his peers to learn new information and required short, precise, repetitive explanations.

- The ALJ inaccurately cited Dr. Huang's August 22, 2003, notes by finding that Dr. Huang opined Plaintiff had only mild cognitive, behavioral, and memory problems. *Plaintiff* reported his impairments were mild, not Dr. Huang; and Dr. Huang opined that Plaintiff had "a lot of deficits" and should pursue tutoring over the summer "when he can concentrate better." In other words, Dr. Huang's notes support the conclusion that Plaintiff suffered limitations that are more severe than mild. Further, this "misinterpretation of . . . evidence . . . contributed to [the ALJ's] improper rejection of Dr. Brown's opinion."

- "[T]he ALJ's analysis of Dr. Huhn's opinion is ambiguous at best, and it does not appear that he, in fact, gave the opinion any weight." (Pl.'s Br. 18.) "[E]ither the ALJ improperly rejected Dr. Huhn's opinion without sufficient analysis or explanation, or he erred by giving his opinion great weight yet finding Plaintiff not disabled." (Pl.'s Br. 18.) Further, Dr. Huhn's opinions support the conclusion that Plaintiff is disabled.

For the following reasons, Plaintiff's assignments of error are not well taken.

An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party; and an ALJ need not make explicit credibility findings as to each bit of conflicting testimony so long as his factual findings as a whole show that he implicitly resolved such conflicts. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)). Here, a review of the ALJ's opinion reveals that the ALJ adequately accounted for Dr. Frye's, Dr. Radwan's, Dr. Litwin's and Ms. Porter's opinions, as well as Plaintiff's IEP records. That evidence

17

supports the conclusion that Plaintiff suffered borderline intellectual functioning and was moderately limited—particularly in maintaining attention, concentration, and pace. The ALJ accounted for these impairments and limitations in his RFC assessment by finding that Plaintiff suffered borderline intellectual functioning and was limited to: simple, routine work in a low stress environment without the demands of a fast pace, high production quotas, or frequent changes in assigned tasks; work where changes in directions can be explained verbally; superficial interaction with others; and environments where Plaintiff could be off task up to 15 percent of the time.

The additional limitations expressed by Dr. Frye, Dr. Litwin, Ms. Porter, and the IEP report mostly were recommendations related to providing Plaintiff with a classroom environment conducive to learning rather than vocational requirements; and Dr. Litwan's opinions about the extent to which Plaintiff could perform construction work are irrelevant because the ALJ's decision is not based on a finding that Plaintiff could perform such work.

In short, Plaintiff has provided an inadequate basis to conclude that the ALJ failed to consider all of the evidence and should have included additional limitations in his RFC determination.

The ALJ reasonably concluded that Dr. Huang's notes supported the conclusion Plaintiff suffered only mild deficits. Dr. Huang's observations that Plaintiff had "a lot of deficits" and difficulty concentrating are not inconsistent with such a finding. Further, any misinterpretation of Dr. Huang's notes would be only harmless error, as the ALJ nevertheless found Plaintiff moderately impaired—particularly in his activities of daily living and in his concentration, persistence, or pace. (Tr. 13.)

To the extent Plaintiff contends the ALJ improperly rejected Dr. Brown's opinions, that argument is waived, as Plaintiff suggests this argument in only one segment of a sentence and presents no legal argument and explanation in support. *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).

The ALJ's assessment of Dr. Huhn's opinions is sufficiently clear.  The ALJ noted Dr. Huhn opined, in part, that Plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions; that Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods of time; and that Plaintiff was "unemployable."  (Tr. 18-19.)  The ALJ gave portions of Dr. Huhn's opinions "great weight" because Dr. Huhn had the opportunity to evaluate Plaintiff; indeed, the ALJ accounted for Dr. Huhn's opinions of marked limitations in his RFC determination.  The ALJ rejected Dr. Huhn's opinion that Plaintiff was "unemployable" because it was "internally inconsistent with the objective testing results" and was an opinion of disability reserved for the Commissioner.  (Tr. 19.)  These are valid reasons for rejecting that opinion, and Plaintiff has not explained how they are insufficient.

Finally, Plaintiff's suggests that Dr. Huhn's opinion Plaintiff was markedly limited supports the conclusion he is disabled because the VE testified that a person with such marked limitations would be precluded from performing work.  Plaintiff's interpretation of the VE's testimony, however, is inaccurate.  The VE testified that a person who was off

19

task 20 percent of the time would be precluded from performing work.  Plaintiff has provided no basis to conclude that Dr. Huhn's opinions shows Plaintiff would be off task 20 percent of the time.

Substantial evidence supports the ALJ's decision, and "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  Accordingly, and for the foregoing reasons, Plaintiff's assignments of error are not well taken.

## VI.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*<br>U.S. Magistrate Judge

Date:  July 12, 2012